UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

       - v. -

JOHN COSTANZO JR. and
MANUEL RECIO,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:
:
:
:
:
:
:

22 Cr. 281 (JPO)

## THE GOVERNMENT'S MOTION TO APPLY
## THE CRIME-FRAUD PRIVILEGE EXCEPTION

DAMIAN WILLIAM
United States Attorney
Southern District of New York

Mathew Andrews
Emily Deininger
Sheb Swett
Assistant United States Attorneys
    *- Of Counsel -*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND........................................................................................................................... 2

      A.    The Investigation............................................................................................... 2

      B.    The Evidence at Trial ........................................................................................ 3

      C.    Additional Relevant Background on the Crime-Fraud Communications.......... **Error! Bookmark not defined.**

ARGUMENT................................................................................................................................ 15

    I.    The Crime-Fraud Exception Applies to the Crime-Fraud Communications ............... 15

      A.    Applicable Law.................................................................................................. 16

      B.    Discussion ......................................................................................................... 18

      C.    Proposed Crime-Fraud Review Procedure........................................................ 23

    II.    At a Minimum, *In Camera* Review of the Crime-Fraud Communications is Justified. 24

CONCLUSION............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*A.I.A. Holdings, S.A.* v. *Lehman Brothers, Inc.*, No. 97 Civ. 4978 (LMM) (HBP), 1999 WL 61442 (S.D.N.Y. Feb. 3, 1999) ............................................................................. 18

*Am. Oversight v. United States Dep't of Just.*, 45 F.4th 579 (2d Cir. 2022) ............................. 16

*Hickman v. Taylor*, 239 U.S. 495 (1947) ................................................................................... 16

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032 (2d Cir. 1984) ................................................................................................................................. passim

*In re John Doe, Inc.,* 13 F.3d 633 (2d Cir.1994) ........................................................... 17, 18, 19

*Loughrin* v. *United States*, 134 S. Ct. 2384 (2014) ................................................................... 20

*Specialty Minerals, Inc.* v. *Pleuss-Stauffer AG*, No. 98 Civ. 7775 (VM) (MHD), 2004 WL 42280 (S.D.N.Y. Jan. 7, 2004) ............................................................................. 18

*United States* v. *Constr. Prods. Research, Inc.*, 73 F.3d 464 (2d Cir. 1996) ............................. 16

*United States* v. *Jacobs*, 117 F.3d 82 (2d Cir. 1997) ........................................................... 20, 21

*United States* v. *Kovel*, 296 F.2d 918 (2d Cir. 1961) ................................................................ 16

*United States* v. *Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579 (S.D.N.Y. Oct. 5, 2015) ...... 20

*United States* v. *Tucker*, 254 F. Supp. 3d 620 (S.D.N.Y. 2017) .......................................... 19, 20

*United States* v. *Zolin*, 491 U.S. 554 (1989) ............................................................... 17, 19, 25

**Statutes**

18 U.S.C. § 1343 ......................................................................................................................... 3

18 U.S.C. § 1346 ......................................................................................................................... 3

18 U.S.C. § 1349 ......................................................................................................................... 3

18 U.S.C. § 2 ............................................................................................................................... 3

18 U.S.C. § 201 ........................................................................................................................... 3

18 U.S.C. § 371 ........................................................................................................................... 3

**Rules**

Fed. R. Evid. 801 ........................................................................................................................ 3

## PRELIMINARY STATEMENT

Defendants John Costanzo Jr. and Manuel Recio (the "defendants") were convicted on November 7, 2023, of bribery, conspiracy to commit bribery, honest services wire fraud, and conspiracy to commit honest services wire fraud. The Government, through members of the team of federal prosecutors and law enforcement agents handling the investigation and prosecution of this case (the "Prosecution Team"), respectfully moves for the Court to rule that the crime-fraud exception to the attorney-client and attorney work product privileges applies to communications between Recio and two defense attorneys, David Macey and Luis Guerra (collectively, the "Crime-Fraud Communications"), which would permit the Prosecution Team to access, review and utilize those materials. In the alternative, the Prosecution Team respectfully requests that the Court conduct an *in camera* review of such materials to determine whether the crime-fraud exception applies.

The Crime-Fraud Communications described below are currently located in two places: (1) on Recio's cellphone and Recio's email accounts, which were obtained pursuant to search warrants (the "Recio ESI"); and (2) on audio recordings and transcripts of intercepted communications occurring over Recio's phone (the "Recio Intercepted Communications"). The Crime Fraud Communications are in the possession of the Government filter team of federal prosecutors and agents who have been walled off from the Prosecution Team (the "Filter Team"), and have not been shared with the Prosecution Team. The Filter Team estimates that the Recio ESI contains approximately 700 documents constituting Crime-Fraud Communications[1] and that

---

[1] Forty-six of those documents are text messages and WhatsApp messages, which contain approximately 7,352 individual messages between Recio and either Macey or Guerra.

the Recio Intercepted Communications contain no more than 160 recordings and transcripts constituting the Crime-Fraud Communications.[2]

The Prosecution Team seeks a ruling from the Court that the Crime-Fraud Communications fall within the crime-fraud privilege exception, so that those materials may be released by the Filter Team to the Prosecution Team pursuant to the procedure described below (at 23). As explained below, the crime-fraud exception applies to the Crime-Fraud Communications because there is probable cause to believe that they were made in furtherance of the offenses of conviction. In the alternative, if the Court deems it necessary to its determination of the application of the crime-fraud exception, the Court should conduct an *in camera* review of any documents or materials containing communications that the Filter Team identifies as Crime-Fraud Communications.[3]

## BACKGROUND

### A. The Investigation

In March 2019, the FBI initiated an investigation into potential bribery involving DEA agents based primarily in Miami, Florida. As part of the investigation, the Prosecution Team obtained search warrants for the Recio ESI and intercepted Recio's phone calls for a period of three months.

---

[2] The Filter Team reviewed the Recio ESI for privileged materials before the Prosecution Team had made any determinations as to whether the materials were responsive to the search warrant. By contrast, the Filter Team's review of the Recio Intercepted Communications occurred after an initial determination that the intercepted communications were "pertinent" to the investigation.

[3] The Prosecution Team assumes, for purposes of this motion only, that the Crime-Fraud Communications would otherwise fall within the scope of the attorney-client privilege, absent the application of the crime-fraud exception. Throughout this submission, "Dkt. [Number]" refers to a docket entry in this case; "Tr." refers to the trial transcript; "GX [Number]" refers to a Government Exhibit at trial; and "DX [Number]" refers to a Defense Exhibit at trial.

On May 18, 2022, a grand jury sitting in this District returned Indictment 22 Cr. 281 (JPO) (the "Indictment"), charging the defendants with participating in a bribery scheme to trade confidential Drug Enforcement Administration ("DEA") information in exchange for financial and personal benefits (the "Bribery Scheme"). (Indictment, Dkt. 1 at 1-16). Specifically, the defendants were charged with one count of conspiracy to commit bribery, in violation of 18 U.S.C. § 371 (Count One); one count each of substantive bribery, in violation of 18 U.S.C. §§ 201 and 2 (Count Two (Costanzo) and Count Three (Recio)); one count of conspiracy to commit honest services fraud, in violation of 18 U.S.C. § 1349 (Count Four); and one count of honest services fraud, in violation of 18 U.S.C. §§ 1343, 1346, and 2 (Count Five). (*Id*. at 16-22).

The Court scheduled trial to begin on October 23, 2023. In its motion *in limine*, the Government asked the Court to admit statements by David Macey, Luis Guerra, and others as co-conspirator statements made in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E). (Dkt. 113 at 14-18). On October 11, 2023, the Court granted the Government's motion, ruling that Macey and Guerra's statements were admissible under Rule 801(d)(2)(E), concluding that there was "sufficient evidence . . . to find that [Macey, Guerra, and others] are co-conspirators." (Dkt. 148 at 47:19-24).

Trial commenced on October 23, 2023. On November 8, 2023, the jury returned a guilty verdict on all counts.

**B. The Evidence at Trial**

*1. Overview of the Scheme*

Manuel Recio was a special agent with the DEA agent from approximately 1997 until his retirement in November 2018. (GX 101). During his time in the DEA, Recio served in the following supervisory roles: group supervisor in the Homestead, Florida office (Tr. 1733:2-6); a

3

staff coordinator in the Financial Investigations Section at DEA headquarters (Tr. 958:3-5); and an Assistant Special Agent in Charge for the Miami Field Division (Tr. 129:5-11). After his retirement, Recio founded Global Legal Consulting LLC ("GLC"), a private investigative firm, and worked with defense attorneys, including David Macey and Luis Guerra.

John Costanzo Jr. was a special agent with the DEA from approximately 2004 through the date of the indictment. (GX 104). During his time in the DEA, Costanzo served in the following supervisory roles: group supervisor for Group 10 of the Miami Field Division (GX 106A); and staff coordinator in the Financial Investigations Section at DEA headquarters (GX 106A; Tr. at 964-965).

For over a year, Recio bribed Costanzo for confidential, sensitive information about DEA cases in exchange for nearly $100,000. Costanzo leaked information from the DEA's Narcotics and Dangers Drugs Indexing System ("NADDIS"), information about grand jury investigations, and information about law enforcement actions on sealed cases. In turn, Recio paid Costanzo bribes through trusted parties, including Costanzo's father and Costanzo's best friend, then-DEA Task Force Officer Edwin Pagan. Recio, Macey, and Guerra used the information Costanzo leaked to recruit and represent DEA targets. Costanzo and Recio took numerous steps to hide their criminal activity, including using a secret phone, deleting messages, and lying on DEA forms and on tax returns.

## 2. DEA Standards of Conduct

The DEA maintains a Personnel Manual that contains Standards of Conduct for DEA employees. The Standards of Conduct are found in Section 2735 of the DEA Personnel Manual. Section 2735.14 mandates "Impartiality in Performing Official Duties." That section bars the "improper use of nonpublic information to further [an employee's] own private interest or that of

4

another, whether through advice or recommendation, or by knowing unauthorized disclosure. Non-public information includes DEA sensitive information (e.g., information that may compromise an ongoing investigation or prosecution, provide an unfair advantage to a company competing for a DOJ/DEA contract, or reveal the identities of confidential sources (CSs) or DEA Special Agents (SAs) or Task Force Officers (TFOs)) . . . ." (GX 113A).

The DEA Standards of Conduct lists certain conduct that constitutes "Misuse of Official Position," including:

> a. "Us[ing] his/her official position for private gain;"
>
> b. "Glean[ing] or garner[ing] information not available to the general public and us[ing] that information for nonofficial purposes. This includes conducting a search in a database that an employee has access to due to his/her employment with DEA;" and
>
> c. "Distribut[ing] or disclos[ing] information not available to the general public for nonofficial purposes."

(GX 113A).

DEA employees are required to receive training on the Standards of Conduct and certify their understanding of the Standards of Conduct on an annual basis. Costanzo completed certification trainings in 2018 and 2019. (GX 105). Recio completed certification trainings in 2016. (GX 110).

### 3. Background to the Conspiracy

Costanzo and Recio were friends who had worked together for many years in the Homestead, Florida DEA office. (Tr. 139, 144). In 2014, Costanzo left the Homestead office to become Group Supervisor for Group 10 in the Miami Field Division. (Tr. 138-139). During his

time as Group Supervisor for Group 10, Costanzo developed close relationships with Macey and Guerra, two criminal defense attorneys based in Miami, Florida. (Tr. 612, 619-620). While these relationships were partly personal, (Tr. 1733-34), since at least 2015, up to and through October 2018, Costanzo provided both Macey and Guerra improper information and access regarding DEA cases. (GX 325, 337; Tr. 611-618; 620-635). For example, in April 2015 Costanzo and Macey exchanged text messages in which Costanzo told Macey he was trying to "close [a] deal" for Macey, who, in turn, told Costanzo: "Close the deal or not, the thought and effort puts you off the chart." (GX 337). Similarly, in 2018, Costanzo and Guerra met Jorge Luis Hernandez Villazon ("Hernandez"), who at the time was an informal DEA source, to ask him to recruit a DEA target for Guerra. (Tr. 611-618).

In October 2018, Recio was preparing to retire from the DEA to begin a second career as an investigator for defense attorneys. (Tr. 634-635). Costanzo knew that Recio was leaving the DEA and introduced Recio and Guerra. (GX 255). Around the same time, Hernandez was helping Macey recruit Group 10 defendants as clients, with Costanzo's knowledge. (GX 325). At some point in October 2018, Hernandez met with Recio at Macey's office, where Recio encouraged Hernandez to recruit clients for Recio's work with defense attorneys. Hernandez recalled Recio telling Hernandez that Hernandez had to "be very careful" regarding this work as it could impact Hernandez's immigration status. (Tr. 635). Hernandez testified to a similar conversation he had with Costanzo around the same time, in which Costanzo reminded Hernandez that Macey "was [Costanzo's] friend and to be very careful with whatever [Hernandez] was about to do [with Macey]." (Tr. 624).

On November 10, 2018, Recio retired from the DEA. (GX 101). Recio received his first

payment—$5,000—from Macey on November 12, 2018. (GX 702 & GX 440B).

### 4. *Costanzo Leaked Information to Recio*

Almost immediately after Recio retired, Costanzo began leaking information to Recio, Macey, and others. On November 13, 2018, Recio texted Costanzo the name "Marco Antonio Flores Moreno." Costanzo replied that "Flores is a general was just appointed to some minister of some shit." (GX 1001). Recio continued to ask Costanzo for information about Moreno and other individuals, asking two days later for Costanzo to "run Moreno and USA D&D." (GX 1001). A few minutes later, Costanzo ran both of those names through NADDIS. (GX 102). For the next year, Recio continued to send Costanzo names, which Costanzo queried in NADDIS anywhere from a few minutes to a few days after Recio sent them. (GX 704B-2). On one occasion, Macey sent a name that Costanzo queried; on another occasion Pagan queried a name that Recio had sent. (GX 704B-2). Costanzo and Recio were often open about the fact that Costanzo was leaking NADDIS information. In one text message, Recio asked Costanzo for "help trying to see if you could help me find any of these guys. You looked before and you said the names were to[o] vague but David is placing a lot of pressure on me." (GX 347). In response, Costanzo said one of the individuals "ran loads to Costa Rica." (GX 347). In another instance, Recio sent Costanzo a name and said, "Call me and give me a summary of his NADDIS." (GX 339).

Costanzo provided all of this information from NADDIS to Recio despite clear warnings that he could not share this information. Agents logging into NADDIS had numerous cautions that the information was "DEA/Law Enforcement Sensitive" and "for Official Use only." (GX 118). Indeed, the DEA witnesses uniformly testified that NADDIS information could not be shared with members of the public. (*E.g.*, Tr. at 161). Costanzo and Recio both knew that. During his interview with law enforcement, Recio acknowledged that NADDIS information was sensitive but falsely

denied ever asking Costanzo to run names in NADDIS. (Tr. at 1345:4-12).

Additionally, Costanzo leaked information about the indictment date for Alex Saab, an individual under investigation for high-level money laundering and foreign corrupt practices in Venezuela. (Tr. 834:22-25, 840:2-4). On July 4, 2019, Costanzo told Recio on a call that "the next indictment" was scheduled for July 25, 2019, the day a grand jury returned an indictment against Saab (GX 202A-T, GX S7). Costanzo assured Recio that Costanzo would "give you what you can say. If you get a meeting, let me know and I'll tell you what to say." (GX 202A-T). Michael Nadler, the Assistant United States Attorney responsible for the investigation, testified that the grand jury proceedings were secret by law and that Costanzo had no authorization to disclose information about Saab's arrest date. (Tr. 841-844, 846-847). Costanzo also knew that sharing this information was unlawful. When the FBI interviewed him in November 2019, he flatly denied ever sharing information or having any conversations about sealed investigations, which was not true. (GX 255-T).

This was not the only instance in which Recio used Costanzo's assistance to try to recruit DEA targets to work with himself and either Macey or Guerra. For example, on April 11, 2019, Recio met with Hernandez, who recorded the meeting at the direction of the FBI. (GX 253A-TR, GX 253B-TR). During that meeting, Recio told Hernandez that there would be an "operation . . . involv[ing] many Venezuelans" and that Recio and Hernandez had to be ready to "pick them up," meaning recruit them as clients. (GX 253B-TR, Tr. 651-652). Recio's advance knowledge of the operation would allow them to be "ready for the day that it happens immediately." (GX 253B-TR). Recio told Hernandez that he would direct these clients to Macey and Guerra, but that Recio wanted to manage the division of work between the two attorneys. (GX 253B-TR ("But everything

8

has to be through me. I... I don't want to start this because then Luis gets angry and Dave gets angry.")). Recio stressed to Hernandez that no one could know they had this information, because otherwise people would ask, "how did it come out?" (GX 253B-TR). Ultimately, Recio directed Hernandez to "do your homework but [shhh]." (GX 253B-TR). Hernandez testified that he understood all of this information about forthcoming indictments came from Costanzo. (Tr. 659).

Less than two weeks later, Costanzo shared additional information with Recio and Guerra to help them get the inside track to representing a Venezuelan Group 10 target. On April 23, 2019, Costanzo texted Guerra the name "Hector Zavala." (GX 397B; GX S7). Guerra then called Hernandez to tell him, "[w]e have a situation which could work for us in a very interesting way." (GX 252B-TR). Guerra told Hernandez that Zavala had been arrested by Group 10 and that "the person who arrested him is someone, we…we know very well." (GX 252B-TR). Hernandez testified that he understood this person was Costanzo. (Tr. 663). Guerra acknowledged that Macey was the other attorney receiving information from Costanzo. (GX 252B-TR). In a follow-up voicemail, Guerra instructed Hernandez not to "tell anybody where that information comes from. . . . [T]echnically we don't want people to know where…where it comes from." (GX 252A-TR). Costanzo appears to have also given Zavala's name to Recio to recruit; on April 23, 2019 (the same day Guerra called Hernandez), Recio texted Costanzo: "What does Zavala do? Any help in trying to find him[?]" Costanzo and Recio then exchanged phone calls. (GX 397A).

Costanzo also provided Recio with inside information while Recio and Macey were trying to recruit Cesar Peralta, a Dominican drug trafficker, as a client. Costanzo knew that Recio and Macey had both traveled to the Dominican Republic to try and recruit Peralta. (GX 201-T, GX 703). At the time, the FBI and the DEA both had sealed cases involving Peralta, though Costanzo

9

had no involvement in either case. (Tr. 373). Yet when Recio asked Costanzo to gather information about the FBI's case (GX 388), Costanzo told no one at the DEA or the FBI he was speaking to Recio, and continued to discuss Peralta with Recio in secret. (DX JC-1009-A). Recio, in turn, discussed with Macey how to leverage the fact that they were "connected [and] informed" to recruit Peralta. (GX 380). Indeed, Both Macey and Recio knew that Peralta wanted to know the "specifics" of his case and would only "pay the rest of the money when [he saw] the proof." (GX 205-T, DX MR 143T). Recio even knew that Peralta had a DEA contact whom Peralta paid "and he tells us who is and who isn't wanted [] for extradition purposes." After hearing this, Recio simply warned Peralta, "[D]on't talk about this with anyone. We're going in 10 days and let's make a plan." (DX MR 141T).

On July 31, 2019, only a few weeks before the FBI attempted to arrest Peralta, Costanzo warned Recio that "the guy in the DR" was "gone in two weeks." (GX 210-T). Tellingly, Costanzo focused on warning Recio not to get caught in the Dominican Republic when the arrest occurred. (GX 210-T ("Don't fuck with that. Stay away from that cause it's dangerous too. Wait for it to happen.")). But Costanzo did not seem to care if Macey continued to meet with Peralta despite a looming arrest date. (GX 210-T ("Let Dave, fuck, if he wants to go whatever you don't and then when the time is right…")). Two days later, when communicating directly with Macey, Costanzo did little to dissuade Macey from "taking a shot" to recruit Peralta only a few weeks before Peralta's arrest. (GX 329).

On August 20, 2019, law enforcement attempted to arrest Peralta in the Dominican Republic, but Peralta was not there. (Tr. 411). Costanzo and Recio discussed the failed arrest in a phone call later that day. (GX 212A-T). However, despite Costanzo's knowing that Recio and

Macey had been in contact with Peralta, Costanzo never shared that information with the case agents. (Tr. 412).

Finally, Costanzo also shared information about cooperating witnesses and informants with Recio concerning Guerra's and Recio's client. In September 2019, Costanzo reviewed and edited a document which summarized information about Recio's client Shirley Herrera Colorado. (GX 330, GX 330A, DX JC-2001). Recio and Guerra were preparing that document as part of a pitch to then-AUSA Nadler to reduce Colorado's sentence. (GX 215-T). However, Costanzo never told Nadler about these conversations with Recio, even though Nadler believed he "should have been included at the conversation. At a very high level, at no time should [an] agent be editing a document for a defense investigator or a defense attorney without [the prosecutor's] involvement." (Tr. 853-54). Costanzo knew that the information he was providing about Colorado was valuable to Recio. While Costanzo and Recio were discussing Costanzo's edits to the document, Recio said, "Make it look good, it's 30 grand right here." (GX 217-T). On another occasion, a "concerned citizen" contacted Costanzo with information about criminal activity, which Costanzo immediately shared with Recio with the instruction "not [to] show anyone." (GX 332 & GX 311-TR).

### 5. Payments to Costanzo

In exchange for violating his lawful duty by sharing DEA confidential information, Costanzo received nearly $100,000 in bribes from the following sources: (i) EBCO International of Miami ("EBCO"); (ii) JEM Solutions ("JEM"); (iii) Pagan; and (iv) gifts provided by Macey.

First, Recio and Macey paid Costanzo $2,500 on November 13, 2018. This was just three days after Recio retired from the DEA and only a day after Macey paid GLC (Recio's private investigative firm) $5,000. (GX 701). By this time, however, Costanzo had already started

communicating with Recio about DEA cases. (GX 704B-2). Rather than pay Costanzo directly, Recio and Macey routed the payment through EBCO, a company Costanzo's parents owned. (GX 421). EBCO had, for the six months leading up to that payment, been completely dormant (Tr. 1682-1683), and had no original, contemporaneous records of the transaction (GX 529). GLC, however, produced documents establishing that the payment to EBCO related to Recio's requests to Costanzo for NADDIS information. (GX 530). Costanzo himself confirmed that the money was his when he told Macey, in a November 13, 2018, text message, "Just made 2500." (GX 317).

Second, Recio paid Costanzo through JEM, a company Pagan incorporated on January 31, 2019. (GX 502). From the outset, Costanzo was involved with JEM: the name was an acronym for John, Edwin, and Manuel (Tr. 1786), and Costanzo referred to it as "our company" in conversations with Pagan. (GX 507). On April 17, 2019, GLC wrote a $10,000 check to JEM. (GX 471A). JEM's records included a handwritten invoice suggesting this was an "[i]nvestment of risk management company." (GX 528). Pagan testified for the defense at trial, and claimed that this $10,000 check was an investment "for office space." (Tr. 1801). According to Pagan, no written documents were necessary because they were good friends so Pagan "didn't think it was necessary." (Tr. 1749:5-13). However, on cross-examination Pagan conceded that he and Recio had no phone calls at all during the relevant period and only sporadic texts, none of which related to JEM. (GX 708, GX 360, Tr. 1796-1797).

GLC wrote a second, $10,750 check to JEM on June 3, 2019. (GX 471B). This check was purportedly related to "services for Johnny Grobman case." (GX 528). Pagan claimed, on direct, that he spent approximately eighty hours reviewing documents for the Grobman case. (Tr. 1767). On cross-examination, however, Pagan could not answer basic questions about the Grobman case

and went back and forth as to whether he took notes on the Grobman work or not. (Tr. 1806-1807).

In fact, the only evidence of activity in JEM's account was Costanzo using it for personal travel. On three separate occasions, Costanzo booked himself first-class travel using the JEM account. (GX 705). Pagan tried to claim that he paid for Costanzo's flights because Costanzo had paid for Pagan's car insurance payments and new tires. (Tr. 1754:8-16, DX JC-2623). But on cross-examination, Pagan admitted that if these insurance payments even existed, they came nowhere close to matching the amount Costanzo spent from the JEM account. (Tr. 1812:16-19).

Pagan also served as a conduit for bribes by providing Costanzo $70,000 in two separate payments, both of which were routed through trusted individuals. First, Pagan gave Costanzo Sr. $50,000 towards the purchase of Costanzo's townhouse. (GX 700). In an attempt to explain this largesse, Pagan testified that this was an investment in Costanzo's townhouse. As with the JEM payments, however, Pagan could not articulate even the most basic facts about this purported investment. (Tr. 1772-1773). Pagan also acknowledged that he and Costanzo agreed Costanzo would lie to the mortgage company to conceal Pagan's involvement in the transaction. (Tr. 1777-79, GX 434A). In January 2020, Pagan paid Susana Rueda, Costanzo's erstwhile girlfriend, $20,000 she had previously loaned Costanzo for an attorney. (GX 701). Both of these payments exceeded Pagan's *entire* available net income in 2019 by more than $8,000. (GX 709).

Finally, Macey bribed Costanzo directly by paying for renovations to Costanzo's townhouse. In February 2019, Macey introduced Costanzo to Juan Victorero, a general contractor. (Tr. 1246-47, GX 333). Costanzo hired Victorero to do some work at Costanzo's new townhouse in Coral Gables, Florida and agreed to pay approximately $9,500. Victorero received over half of the money Costanzo owed him not from Costanzo but from Macey. (Tr. 1253, GX 336). Though

Costanzo told Victorero to collect the money from Macey because Costanzo was out of town, Costanzo's text messages with Macey clearly show that Costanzo was in Coral Gables the day that Macey paid Victorero. (GX 336). In addition to paying for the renovations, Macey also paid over $1,136 for Yankees tickets for himself, Costanzo, and Nic Palmeri, another high-ranking DEA supervisor. (GX 525, GX 355, GX 385). Macey then paid for a nearly $700 dinner at a restaurant in New York City that same weekend. (GX 525).

These bribes from Macey were consistent with communications in which the co-conspirators discussed Macey and Guerra funding the Bribery Scheme. For example, in April 2019, Costanzo and Recio discussed whether they could "talk to Lui [Guerra] to go 50/50" on a client matter. (GX 384). On a July 4, 2019, phone call between Costanzo and Recio, however, Costanzo complained that Guerra had not "[brought] anything to the table," meaning money. (GX 202B-T). Recio countered that Guerra had brought approximately $130,000 to the scheme. (GX 202B-T). The very next day, Costanzo spoke with Guerra on the phone. Guerra complained that Costanzo had ignored him, to which Costanzo replied that Guerra needed to "love" Costanzo because Costanzo would be "running this fucking thing [the DEA] pretty soon." (GX 203-T). Guerra replied, "Okay, listen, so we're here scheming about how we're going to make money, money, money, so we're all on the same page." (GX 203-T).

### 6. Costanzo and Recio Hid the Scheme

Costanzo and Recio took numerous steps to hide the Bribery Scheme from the DEA and others. Most significantly, Costanzo and Recio covered their communications by using a secret phone (the "Secret Phone") and deleting their communications. Recio paid for the Secret Phone, though Costanzo was the user of the phone. (Tr. 464-468, GX 208-T, GX 209-T). When confronted about the Secret Phone in their interviews with FBI and DOJ-OIG, both Costanzo and Recio denied

14

and downplayed the significance of the Secret Phone. (GX 3548-0002a, GX 255-T). But many of the calls where Costanzo leaked sensitive information occurred on the Secret Phone. (GX 203-T, GX 207-T, GX 210-T, GX 708). Additionally, Costanzo and Recio collectively deleted hundreds of messages from their phones, including messages in which they discussed the Bribery Scheme. (GX 708, GX 361A, GX 361C, GX 363A).

Beyond hiding their communications, Costanzo and Recio lied to others about the nature of their relationship. Costanzo never disclosed his work with Recio to his supervisors in the DEA. (Tr. 145, 970-971). In fact, when ASAC Daniel Escobar asked Costanzo what Recio was doing after his DEA retirement, Costanzo said, "Manny is doing his thing" without disclosing his involvement with Recio. (Tr. 144-145). Costanzo also hid his work with Recio on his SF-86 form in 2020, which required a disclosure of "all employment activities." (GX 104). Costanzo, Pagan, and Costanzo Sr. also failed to report the tens of thousands of dollars flowing between them on their IRS forms. (Tr. 1165, 1169-1170). And when Costanzo and Recio learned about rumors relating to the Bribery Scheme, they discussed how they would "find people to put problems on" the individuals spreading those rumors. (GX 214-T).

## ARGUMENT

### I.     The Crime-Fraud Exception Applies to the Crime-Fraud Communications

The Government, through the Prosecution Team, respectfully moves for a ruling from the Court that communications between Recio and Macey, and communications between Recio and Guerra, fall within the crime-fraud exception to the attorney-client and work product privileges, so that any documents or recordings falling within that exception may be released by the Filter Team to the Prosecution Team pursuant to the procedure described below (at 23). As explained below, the crime-fraud exception applies to these communications because there is probable cause

to believe that they were made in furtherance of the Bribery Scheme.

### A. Applicable Law

The attorney-client privilege protects from disclosure certain communications involving a client and his legal adviser related to the provision of legal advice. *See, e.g.*, *United States* v. *Kovel*, 296 F.2d 918, 921 (2d Cir. 1961). "To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." *United States* v. *Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). In *Hickman v. Taylor*, 239 U.S. 495 (1947), the Supreme Court first articulated an attorney "work product" privilege over "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs" prepared for a client's case. *Id.* at 511; *see also Am. Oversight v. United States Dep't of Just.*, 45 F.4th 579, 588 (2d Cir. 2022).

The privilege, however, is not absolute. "It is well-established that communications that otherwise would be protected by the attorney-client privilege or the attorney work product privilege are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984), quoted with approval by *In re John Doe, Inc.*, 13 F.3d 633, 636 (2d Cir.1994). The rationale for this crime-fraud exception to those privileges "is closely tied to the policies underlying these privileges." *In re Grand Jury Subpoena*, 731 F.2d at 1038. "Whereas confidentiality of communications and work product facilitates the rendering of sound legal advice, advice in furtherance of a fraudulent or unlawful goal cannot be considered 'sound.'" *Id.* "Rather advice in furtherance of such goals is socially perverse, and the client's

16

communications seeking such advice are not worthy of protection." *Id.* Accordingly, the purpose of the crime-fraud exception is to "assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *United States* v. *Zolin*, 491 U.S. 554, 563 (1989) (quotation marks and citations omitted).

For the crime-fraud exception to apply, the Government must show that there is probable cause to believe that (1) a fraud or crime has been attempted or committed, and (2) the attorney-client communication or attorney work product in question was intended in some way to facilitate or to conceal the fraud or crime. *See In re Grand Jury Subpoena*, 731 F.2d at 1038. The probable cause standard in this context is "not an overly demanding" one. *A.I.A. Holdings, S.A.* v. *Lehman Brothers, Inc.*, No. 97 Civ. 4978 (LMM) (HBP), 1999 WL 61442, at \*5 (S.D.N.Y. Feb. 3, 1999); *In re John Doe, Inc.*, 13 F.3d at 637 (citing *In re Grand Jury Subpoena*, 731 F.2d at 1039). Thus, to find that the crime-fraud exception applies, the Court need only conclude that "a prudent person [would] have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena*, 731 F.2d at 1039.

The crime-fraud exception applies to communications and documents in furtherance of a crime or fraud even if the attorney involved in such communications is unaware that his services are being used in furtherance of a crime or fraud. *See id*. at 1038 ("Such communications are properly excluded from the scope of the privilege even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose."). Furthermore, "the crime-fraud exception embraces common-law fraud" (*Specialty Minerals, Inc.* v. *Pleuss-Stauffer AG*, No. 98 Civ. 7775

17

(VM) (MHD), 2004 WL 42280, at *9 (S.D.N.Y. Jan. 7, 2004)), and "has been interpreted to encompass misconduct fundamentally inconsistent with the basic premises of the adversary system" (*United States* v. *Tucker*, 254 F. Supp. 3d 620, 622 (S.D.N.Y. 2017) (quotation marks and citation omitted)). The crime or fraud need not have actually occurred for the exception to be applicable; it need only have been the objective of the client's communication. *See In re Grand Jury Subpoena*, 731 F.2d at 1039. And the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent. *See id.*

Where it is not clear whether the crime-fraud exception applies to a set of documents that one party asserts to be privileged, courts in this Circuit have discretion to conduct an *in camera* review of those documents. *See, e.g.*, *In re John Doe, Inc.*, 13 F.3d at 636. Thus, to obtain *in camera* review of such materials, the Government need not meet the "probable cause" standard described above. Instead, prior to an *in camera* disclosure of purportedly privileged communications, a court "'should require'" only "'a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.'" *Id.* (quoting *Zolin*, 491 U.S. at 572).

### B. Discussion

The Government has set forth sufficient evidence to allow "a prudent person [to] have a reasonable basis to suspect the perpetration of a crime or fraud, and that the communications [in question] were in furtherance thereof." *In re Grand Jury Subpoena*, 731 F.2d at 1039. Accordingly, the Government respectfully requests that the Court order that the crime-fraud exception applies

to the Crime-Fraud Communications.

      *1. There was a Crime or Fraud*

There is "a factual basis for a showing of probable cause to believe that a fraud or crime has been committed" in this case. *See United States* v. *Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997) (*abrogated for other reasons by Loughrin* v. *United States*, 134 S. Ct. 2384 (2014)). Courts have held that an indictment furnishes sufficient probable cause to meet this threshold. *See, e.g.*, *Tucker*, 254 F. Supp. 3d at 624 ("the fact that a grand jury issued the Indictment . . . supports a finding of probable cause that a crime was committed" for purposes of the first element of the crime-fraud exception); *United States* v. *Levin*, No. 15 Cr. 101 (KBF), 2015 WL 5838579, at *5 (S.D.N.Y. Oct. 5, 2015) (same). Here, two of the co-conspirators, Costanzo and Recio, have been convicted at trial after the Prosecution Team set forth overwhelming evidence of their guilt and the overall nature of the scheme. There can be no dispute about the existence of the Bribery Scheme.

      *2. The Relevant Communications were in Furtherance of a Crime or Fraud*

Based on the evidence set forth above, there is also probable cause to believe that the Crime-Fraud Communications described above "were in furtherance of [a] fraud or crime." *Jacobs*, 117 F.3d at 87. The evidence at trial established that Costanzo leaked information to assist Recio's investigative work for Macey and Guerra, who were determined by the Court to be co-conspirators in the Bribery Scheme, and that Macey and Guerra knew that Recio was receiving information from Costanzo. These two facts, taken together, furnish a sufficient basis to conclude the Crime-Fraud Communications were in furtherance of the Bribery Scheme.

Throughout the Bribery Scheme, Costanzo repeatedly leaked information to Recio to benefit him and the attorneys he worked with, Macey and Guerra. This began with helping Recio identify potential clients for Macey and Guerra. For example, on May 7, 2019, Recio asked

Costanzo to look up a "[p]otential new client for David," after which Costanzo gave Recio information about the individual. (GX 344). On May 13, 2019, Recio sent Costanzo another name to look up, stating, "He's huge. Gotta be a Guerra case." (GX 345). On May 14, 2019, Recio asked Costanzo to try looking up certain names again. Recio told Costanzo "David is placing a lot of pressure on me." (GX 347). And on July 4, 2019, Costanzo told Recio that a new AGEO [Attorney General Exempt Operation] would "touch some stuff that you're doing." Recio replied, "That's where . . . Dave, with the referrals, is gonna start seeing the shit." (GX 202B-T).

Costanzo also leaked information about indictments and arrests to benefit Recio, Guerra, and Macey. On April 11, 2019, Recio told Hernandez about a forthcoming DEA arrest operation and told Hernandez he wanted to steer these defendants to "Luis" and to "David." (GX 253B-TR). A few weeks later, Costanzo told Recio and Guerra about a new DEA arrest so that they could recruit the client. (GX 252B-TR, GX 397A, GX 397B).

Beyond leaking information to help Macey and Guerra find potential clients, Costanzo also discussed with Recio how they could assist Macey and Guerra with existing clients. In April 2019, Recio told Costanzo that he was going to "recommend[]" Guerra as an attorney for an indicted defendant. Recio then said, "Maybe we can talk to Lui to go 50/50." Costanzo replied, "Meeting with him manana." (GX 384). Similarly, in September 2019, when Recio sent Costanzo the Hererra Colorado document for Costanzo's input, Recio told Costanzo the document would first go to "Louie." (GX 215-T).

The fact that Costanzo was providing information to benefit Macey and Guerra's criminal defense practice provides sufficient probable cause that the Crime-Fraud Communications were in furtherance of the Bribery Scheme. Recio's conversations with Macey and Guerra were integral

to the Bribery Scheme; Costanzo was leaking information so that Macey and Guerra could bring in more clients, and part of the scheme required Recio to convey the inside information to Macey and Guerra. Notably, the communications would be in furtherance of the Bribery Scheme even if Recio did not disclose the unlawful source of the information to Macey and Guerra. *See In re Grand Jury Subpoena*, 731 F.2d at 1038. Costanzo and Recio both knew that Macey and Guerra would pay for Recio's information (GX 202B-T), and so Recio's communications with Macey and Guerra were necessary to the scheme whether Macey and Guerra knew it came from Costanzo or not.

There is, however, clear evidence that both Macey and Guerra knew that Costanzo was leaking the information in violation of his duties. While Costanzo primarily communicated with Recio about DEA information, there were instances where both Macey and Guerra directly received assistance from Costanzo. For example, on August 7, 2019, Macey texted Costanzo a name, which Costanzo queried in the NADDIS database less than two hours later. Macey and Costanzo then spoke by phone later that evening. (GX 704B-2). In June 2019, Costanzo created a WhatsApp chat group named "Work" with Recio and Guerra, in which he shared certain information about a potential client with Guerra and Recio. (GX 1034). Macey and Guerra's knowledge that Costanzo was leaking information provides stronger evidence that the Crime-Fraud Communications were in furtherance of the Bribery Scheme, since it makes it even more likely that Recio discussed with Macey and Guerra that he was providing them with DEA confidential information to help their law practices.

Indeed, the Cesar Peralta case shows how Macey's communications with Recio were in furtherance of the Bribery Scheme.[4] In June 2019 Macey and Recio first began trying to recruit Peralta as a client. (GX 703). On June 14, 2019, Recio reported to Costanzo that he and Macey had "landed the client" from the Dominican Republic. Costanzo replied, "Yeah Dave called." (GX 363A). On June 24, 2019, Macey, who had already spoken with Costanzo about Peralta, instructed Recio to gather information about Peralta's case—"something impressive . . . [to] show him we are connected, informed and capable of leading him through the mess." (GX 380). On July 1, 2019, Recio asked Costanzo to contact an FBI Special Agent for information about the FBI's investigation into Peralta. (GX 388). Macey and Recio continued to discuss the need for inside information to placate Peralta. In a July 11, 2019, phone call, Macey told Recio that Peralta would not pay until he knew "specifics," such as his co-conspirators and the offense conduct. (GX 205-T). As Special Agent Brandon Jaycox testified, all of this information was under seal at that time. (Tr. 401, GX S7).

Only a few weeks before Peralta's arrest, Costanzo alerted Recio about the upcoming arrest and warned Recio to "[s]tay away from that." (GX 210-T). A few days later, Macey told Costanzo he was still "[t]rying hard to get Cesar." (GX 329). Again, Costanzo said to wait until the arrest occurred, but Macey told Costanzo he was "[t]aking a shot." (GX 329). Costanzo discussed Peralta with both Recio and Macey and, unsurprisingly, when Macey and Recio discussed the case, they both discussed exploiting confidential information that they could share with Peralta. Those communications clearly were in furtherance of the Bribery Scheme and strongly indicate that all

---

[4] As the Court is aware, the Prosecution Team has reviewed the Recio ESI and Recio Intercepted Calls related to Peralta based on a factual determination that the attorney-client privilege was inapplicable. (Dkt. 148 at 78).

of Recio's communications with Macey and Guerra would similarly be in furtherance of the scheme.

### C. Proposed Crime-Fraud Review Procedure

The Government respectfully submits that an *in camera* examination of each individual document falling within the Crime-Fraud Communications is not necessary because the evidence set forth above easily meet the probable cause standard for applying the crime-fraud exception. Accordingly, further review of such documents is unnecessary to establish that the crime-fraud exception applies to the Crime-Fraud Communications and the Court should rule that the crime-fraud exception applies to the Crime-Fraud Communications.

Because the Crime-Fraud Communications may implicate the attorney-client privilege of third parties not involved in the Bribery Scheme, the Government will serve a copy of this motion on counsel for Macey and Guerra, who are best positioned to know which of their former or current clients would be impacted by the motion. If any such clients raise concerns about disclosure of the attorney-client privilege, the Filter Team will engage with those third parties to identify potentially privileged information that was not in furtherance of the Bribery Scheme.

In order to prevent any unnecessary delay and facilitate expeditious review of the materials, the Filter Team will provide any third-party clients with a reasonable timeframe—for example, two weeks—within which to respond to the Filter Team with any objections to the Filter Team's determinations, before releasing the documents and witness materials to the Prosecution Team. To the extent the parties cannot reach agreement as to certain documents or communications identified in the Crime-Fraud Communications, the Court may conduct an *in camera* review as to the particular communications in dispute.

## II.    At a Minimum, *In Camera* Review of the Crime-Fraud Communications is Justified

In the alternative, if the Court deems it necessary to its determination of the application of the crime-fraud exception, the Court should conduct an *in camera* review of any documents or materials containing communications that the Filter Team identifies as Crime-Fraud Communications. As noted above, the Government need not establish probable cause to obtain such an *in camera* review; instead, the Government must show only "a factual basis to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies," to such communications and documents, making such a review appropriate. *Zolin*, 491 U.S. at 572 (quotation marks and citations omitted). This standard is not "a stringent one." *Id.*. The Government respectfully submits that the facts outlined herein go well beyond establishing a good-faith belief that *in camera* review may reveal evidence that crime-fraud exception applies to the two categories of Crime-Fraud Communications discussed above.

24

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully requests that the Court rule that the Crime-Fraud Communications described above are subject to the crime-fraud exception to any otherwise applicable attorney-client or work product privilege and direct the release of those communications to the Prosecution Team, or, in the alternative, that the Court conduct an *in camera* review of the documents and materials reflecting the Crime-Fraud Communications to determine whether the crime-fraud exception applies.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/
      Mathew Andrews
      Emily Deininger
      Sheb Swett
      Assistant United States Attorneys
      Southern District of New York
      (212) 637-6526/-2472/-6522

Dated: January 22, 2024
      New York, New York